May I please look for Jennifer Bennett for the Appellant Matthew Sponer. I'd like to try to reserve five minutes of my time for rebuttal. Sure, go ahead. The jury's job of determining what punitive damages to award, that is, what amount of money will adequately punish and deter the defendant, requires the jury to answer essentially two questions. First, how bad is the defendant's misconduct, how reprehensible is it? And second, what amount of money is going to therefore carry the right amount of sting to ensure that the defendant doesn't do it again? To answer these two questions, the jury needs tools. And two crucial tools, the fundamental building blocks of most rational punitive damages awards are, one, evidence that allows the jury to accurately assess how reprehensible the defendant's misconduct was, and two, evidence about the financial condition of the defendant so the jury can assess what amount of money is going to carry what amount of sting. And here, the district court made fundamental legal errors that systematically undermine both of these building blocks, pulling them out from under both the plaintiff and the jury, and making it impossible for the jury to do its job. By permitting Wells Fargo to rely on written procedures it had produced on the eve of trial, and to blame Mr. Sponer for the bank's own misconduct, the district court allowed Wells Fargo to undermine the reprehensibility of its conduct at every turn. And by instructing the jury at the last minute that it could not consider net worth, the district court removed the only tool the jury had to assess Wells Fargo's financial condition, and to determine what amount of sting an appropriate punitive damages award would have. Can I ask you to focus on the written policies? Of course. Just zero in on that, and assume that we agreed with you that the policy should not have been admitted under Rule 37. Help me understand why they were the difference maker in your view, because the jury did find in your favor on the willfulness, but just decided not to award any actual punitive damages. So help me understand why those were so critical in your view to the jury's assessment of Wells Fargo's conduct. Sure. So what they did is they enabled Wells Fargo to argue to the jury. And Wells Fargo did this explicitly, I think that's ER 97, explicitly argued to the jury. Even if you find willfulness, you still should not award punitive damages, because we have these procedures in place already. So essentially, we don't need to change our conduct. Some people made some mistakes, we'll fix that, but we have these procedures in place. And by allowing the bank to introduce those without any discovery on them, it disabled Mr. Sponer from, for example, deposing the bank's employees and saying, hey, have you ever seen these procedures? Have you used them before? And the reason that's a difference maker is for two reasons, actually. Wells Fargo's argument is the evidence would have been the same no matter what, but that's in fact not true. First, without these written procedures, Wells Fargo's argument essentially would have been, hey, we have these procedures that comply with the law, trust us. Where are they? Well, you can't see them, but our employees say we have them, so don't worry about them. That's a much different case than here are the written procedures you can look at and determine whether they comply with the law. Can I jump in just to be real specific? Tell me if I've gotten the facts wrong. I understood the deposition testimony that you had from the employees to be, listen, we're in the credit bureau. We don't have the authority to clear this thing until the fraud people tell us it's OK. Right, so it's all on the fraud people. We're just, the credit bureau folks were helpless, and we're totally dependent on the fraud people. The written policies, don't they just basically say the same thing? So in other words, in closing argument, wouldn't Wells Fargo have just made the exact same argument, but they'd just be relying on the witness testimony as opposed to a piece of paper? No, Your Honor, and that's, again, for two reasons. The first is that the written policies have a whole section about things that are easily identified as fraud. And that is not in the Wells Fargo's employee's testimony. And what Wells Fargo says is, well, our corporate representative, Ms. Braxton, testified about that. But in fact, most of the sites that they have don't say that, and her testimony was pretty confusing. So for example, on ER 98, she actually testified that in accordance with this easily identified as fraud procedure, their employees in the credit bureau are not prohibited from finding, making a finding of ID theft. She later then contradicted herself and said they are prohibited from making a finding of ID theft. So you have this contradictory, confusing testimony of Wells Fargo's employees, and what Wells Fargo says at closing, and this is ER 90 and 91, it says, hey, you've had all this testimony about our procedures. Don't worry about that. You have the written procedures, so look at the written procedures and read those. And those written procedures are clear, and they have this section about something that is easily identified as fraud, and it says that it's easily identified as fraud. Delete that. And I'll note that Wells Fargo's counsel in closing emphasized that section of the procedures and never said, hey, actually, this just means that we refer it to the fraud department and don't do anything. And so without the written procedures, what you have is this sort of confusing, conflicting testimony from Wells Fargo's employees. And having the written procedures allow Wells Fargo to say, actually, we have these procedures. They comply with the law, and part of the reason they comply with the law is they say, if you could easily identify something as fraud, you delete the account. And without the written procedures, they wouldn't have been able to say that. They would just have this confusing, contradictory testimony from their employees. Can you point me to where – I guess I didn't read the record that way. I thought Wells Fargo's argument was even in the circumstance where it's easily identified as fraud, you still have to wait for the fraud department to give you the okay. So the only testimony – so in the closing argument, Wells Fargo's counsel did emphasize this easily identifiable as fraud part, and I will – its argument on the procedures is ER 90 to 96, and I can find the exact site for you. No, that's okay. I mean, I've looked at that, and I'll look at it again. The only testimony about this easily identifiable as fraud argument that they cite is Ms. Braxton's testimony, and in fact, her testimony there is contradictory. So if you go to ER 98, for example, what she says, in fact, is that the credit bureau employees are not prohibited from making a finding of ID theft. On the other hand, she says at ER 162, if fraud is investigating, the credit bureau should just move forward with their investigation also. At another page, ER 102, she says, actually, you should let fraud do their job. And she repeatedly says, well, we've worked with the fraud department. That's, for example, at SER 276. And so the only testimony we have on that is really contradictory, including statements that say actually they could delete this information. And then you have – and that's, you know, somewhere in the middle of the trial. And then you have Wells Fargo's counsel standing up at oral – or rather a closing argument and saying, okay, you've heard a bunch of testimony. Don't worry about that. Just look at these written procedures, and here's the pathway of the written procedures. Pathway one, if it's easily identifiable as fraud, you delete it. And so what it – it enabled Wells Fargo to pave over these – the bumpiness, essentially, in its employees' testimony and present something that is clear and easy to follow and seems like it might comply with the law without giving Mr. Sponer the opportunity to, for example, depose Wells Fargo's employees and say – you know, where they could say, actually, we've never seen these before. I don't know. You know, we've never followed these policies. And this wasn't the only error the district court made. So pulling out the reprehensibilities, you know, affected the reprehensibility building block of the jury's punitive damages award. But the district court also withdrew from the jury any ability to assess the sting of a punitive damages award to determine whether and in what amount punitive damages were necessary at all by instructing the jury that it could not – it could not consider Wells Fargo's net worth. And I don't want to know it as an initial matter. That instruction is just wrong as a matter of law. You know, over and over again, the Supreme Court and this court have confirmed that net worth is admissible. That's, for example, Haslip and TXO from the Supreme Court. It's White and Baines from this court. But he – Counsel, he was prepared to give a net worth instruction to the jury. That was in the – that was in his instructions. That's right. And the effect of the stipulation is to the net worth. And when he did, Counsel argued for 165 million in punitive damages. After they came back from the break, there was a whole discussion about whether or not that was proper. And it was in response to that that the judge instructed the jury they couldn't consider net worth as a clarification or as an admonition, but to remedy what Wells Fargo argued was harm to them. So if you look at it in that context, why was that an abuse of discretion on the part of – or an error of law on the part of the district judge? Two answers to that. The first is that there was no prejudice to Wells Fargo. The jury's job is not to award an amount of damages that is within or exceeds some constitutional limit. That's the court's job as a matter of law, after the jury makes its determination, to figure out what the constitutional ceiling is. And then if the jury awards an amount that exceeds that ceiling, the court reduces it. There's never any danger. The only prejudice Wells Fargo identified was the possibility that the jury's award would exceed this constitutional ceiling. There's never any danger that that could possibly happen. And the second reason that – Well, why couldn't the judge try to deal with it up front? Why does he have to wait until the jury retrains their verdict? I'm sorry, Your Honor? Why does the judge – Why can't the judge deal with it up – you know, address the problem up front when it happened? There are two reasons. There was no real basis to argue for $165 million in punitive damages. You know, that is hard to say, actually. You know, in TXO, the Supreme Court approved a ratio of 526 to 1 in a period – We're dealing with – here, there was an award of $100,000 for emotional damages? Correct, Your Honor. And for that, you get $365 million in punitive damages? $165 million in punitive damages? So two answers to that, Your Honor. The first is that that number is to help the jury assess what kind of sting Wells Fargo is going to suffer. But second – and so the jury's job is not to assess the constitutionality. Well, counsel knew the judge had to assess during the conference when they came back. The counsel knew that that was not going to survive. An award of that amount of money was not going to survive. The second answer is – And counsel refused to acknowledge that. I mean, you just kind of danced around it. Even if that comment was inappropriate, the proper response to an inappropriate comment and closing argument, particularly one that cannot possibly prejudice the defense of the other party, is to strike the comment. It's not to issue a jury instruction that is wrong as a matter of law and withdraws from the jury an ability to use a fundamental tool it needs to assess what punitive damages are appropriate. Jury instructions have to be correct as a matter of law. And Wells Fargo doesn't dispute that a judge cannot punish a party by issuing an incorrect jury instruction. And that's exactly what happened here. Without knowing Wells Fargo's net worth, without being able to consider the fact that Wells Fargo is not an individual or a small business, but rather a multibillion-dollar company, the jury had no way of being able to determine that punitive damages were even necessary here. Because the compensatory damages here are, as you pointed out, $100,000, which means that the jury had to be able to consider that Wells Fargo is not an individual, not a small business, that it needed more deterrence and punishment than what was already encapsulated in the $100,000 compensatory damages award. If there are no questions, I'd like to reserve the remainder of my time for rebuttal. May it please the Court, Julie Smith on behalf of Wells Fargo Bank. By all objective standards, Plaintiff won below. The jury found the defendant willfully violated the FCRA and awarded a substantial amount of non-economic damages, even though Plaintiff suffered no pecuniary harm. Still, Plaintiff appealed, seeking a do-over on punitive damages based on three claimed errors. I plan to focus my argument today on the first issue, relating to the late disclosure of Exhibit 560, because there are compelling reasons why the Court should not even reach the merits on the other two issues, those reasons being preservation, waiver, or problems with those two claims of error. With respect to the first issue on Exhibit 560, the starting point should be the standard of review. This Court gives a particularly wide latitude to district court decisions in this area on Rule 37 sanctions. And for good reason, the district court is the boots on the ground. The judge is the one in the best position to assess, in light of information available to the judge at that time, whether the late disclosure is substantially justified or harmless under the rule. The problem, counsel, is that the district court, it seems to me, applied the wrong legal standard in assessing harmlessness. The question is whether the late production can be remedied in an easy way, and the production of your 30B6 witness, I guess it was, was useless in terms of trying to cure the prejudice from the late disclosure. And so I think the plaintiff's argument stands that, listen, we would have deposed all of those other witnesses earlier in the case in a completely different way if we had these written policies in front of us. We were deprived of that opportunity, and nothing the district court did made up for that deficit. Well, I read the district court's ruling differently. I think that the court did not apply the wrong standard. The court, when it referred to prejudice, it was talking about prejudice of the evidence. I mean, it was talking about the significance, the importance, the relative importance of the evidence. It wasn't saying that it was an unfair prejudice to have the late disclosure. That's not how I read the court's decision. But the court did hold that it was not a willful violation of the rule, and the court did conclude that it wasn't an important exhibit in the grand scheme of things, based on what the district court understood at that time, because, of course, that's what matters in making that, in evaluating the discretion of the court. That's my question, I guess, on the legal standard. Isn't that the wrong inquiry? I thought the inquiry under Rule 37 was, is the late production itself harmless? Harmless in a sense that, I don't know, there are other ways we can cure the fact that this wasn't produced when it should have been, or that other discovery that had already been taken sort of takes care of this. And so in the larger scheme of things, there's really no harm to the plaintiff that you didn't have this document in your hands way back when discovery was still open. I thought that was the inquiry, not what impact is this going to have on the outcome of the trial. I agree with you that that is the correct inquiry. I think that the court did not make a legal error in at least in analyzing what the relative importance of the evidence was, because that's part of the determination of harm. Courts typically, actually, even though the rule does itself refer in the disjunctive to whether it is substantially justified or harmless, courts actually apply a multi-factor test in deciding whether to exercise discretion. Most circuits have applied this multi-factor test that looks at several factors, including whether there's bad faith or willfulness, the degree of prejudice or surprise, whether the plaintiff has an ability to cure, and the relative importance of the evidence, and then finally whether it will disrupt the trial. And this court, in an unpublished decision, Lannert-Toyce, did apply this multi-factor test to determine whether a trial court abused its discretion under the circumstances, And again, the court found that this was not a willful violation. The court found that it was in the relative scheme of things. This was not an important exhibit. And more importantly, the court gave plaintiff an opportunity to cure. And it wasn't... Plaintiff misleadingly claims that the witness that plaintiff was able to depose pretrial, Ms. Braxton, did not know if she had ever seen the Exhibit 560 before or whether they were even relevant. That's not a fair characterization of what Ms. Braxton said in her pretrial deposition. What plaintiff actually asked Ms. Braxton was, Have you ever seen these procedures before you got involved in this lawsuit? That's at ER 191. Now, of course, Ms. Braxton became head of this department in April of 2019, just a few months before trial. So that's misleading to say that when she was deposed on these exhibits that she didn't know anything about them. Of course she did. She may not have known anything about them before she got involved in the lawsuit because she wasn't the head of the department before she got involved in the lawsuit. So it's misleading to characterize that that way. Plaintiff had an opportunity to depose the corporate representative on the substance of this exhibit. I think the plaintiff's complaint is that there wasn't an opportunity to depose the other witnesses who were involved in the handling of his account on the existence of these policies. And that corporate representative's testimony can't make up for that. It can because the evidence has been consistent all along that all these ACDB department employees were following the policy that they waged for a pending fraud department investigation to complete before they can delete an account. It was consistent. Ms. Berg testified that in her pretrial deposition. Ms. Braxton said it clearly during her trial testimony. That evidence hasn't changed. And at least one other of the witnesses who were deposed. Plaintiff, there's nothing about this exhibit that is even relevant to this trial other than that particular policy. So can we switch then to the prejudice inquiry, assuming that we did not agree with you on the Rule 37 issue. So the plaintiff says that in closing argument, Wells Fargo pointed to the cases I easily identified as fraud part of the policy as sort of being one path that the employee would go down and presumably could quickly delete that reference from the credit report as opposed to these other cases. And that never was explained in the witness testimony. So it really was the written policies that your client was able to rely upon to suggest that, no, no, no, we have a policy that should have taken care of this particular case right up front, and there was just employee error that caused that. That's not the context in which that is taken out of context. During closing, there were some passing references to the policy. But the focus of closing argument, the very clear focus on the closing argument, was that the ACDB responders were following this policy to not delete an account when there is a pending fraud investigation. And argued during closing that it was a reasonable policy to defer to the policy as a fraud group. That's at SER 130-35. And the evidence was that they had no option but to verify the account under the existing policy. That's at SER 215. Plaintiff points out that the argument during closing was that this was just human error, that we have good policies in place and this was a human error problem, and suggests that that has anything to do with the ACDB policy, Exhibit 516. It doesn't. The human error when Wells Fargo blamed human error during closing argument was referring clearly to the human error that occurred in the fraud department, which also has policies in place. And those policies were also discussed thoroughly at trial. And the reference during closing was that Brady, a fraud department employee, had made a mistake. And that's at SER 220. And that if Brady had validated the fraud earlier, then the ACDB responders would have deleted the account. And that's at SER 221. So the argument was that the ACDB responders were following the policy that had been discussed in discovery of deferring to an ongoing fraud investigation. And lastly, when analyzing harmless error, again, the jury found there to be a willful violation. So the jury concluded that it wasn't just a human error problem. There was something wrong with the policies, obviously. The jury didn't like the policies or wouldn't have found a willful violation. Ms. Smith, let me ask you a question if I could. The curative jury instruction that the judge gave after plaintiff's closing argument seems to me to have amounted to a flat prohibition on considering net worth of the defendant in assessing and evaluating punitive damages. That's clearly wrong, isn't it? Net worth is commonly referred to as part of the analysis of punitive damages. How did that not affect the punitive damages award, which, as it turned out to be, was zero after a willful violation? I'll address in a minute whether that was clearly wrong because I disagree that it was. But I'll answer your question, I think, which gets towards whether that was really harmless. It was harmless to give that instruction because that net worth, if it's ever admissible and relevant, goes to the amount of punitive damages. It does not bear on whether a jury should award them in the first place. The jury decided to exercise its discretion not to award any punitive damages. And so it didn't even reach the part of a punitive damages decision in which it would have considered net worth. It would have had an opportunity to consider net worth if it was relevant. But it is not relevant. Even if net worth is relevant in some cases, it's not relevant in this one. The Supreme Court has long raised red flags about wealth evidence and concerns about them. I quoted them. I quoted those concerns at length in the briefing. No binding case holds that net worth evidence is always admissible. Courts typically say it's traditionally admissible. But that doesn't mean that it's always. Even in White v. Ford, this court's decision in White v. Ford, that's quite a bit different from this case. It was a $2.3 million compensatory damage and $11 billion net worth. Really night and day compared to this case. We have an FCRA violation, no economic losses, low non-economic damages. And in the FCRA context, it's usually a 4 to 1 ratio is the maximum. We've cited cases in the briefing on that. That is usually the constitutional maximum. So in this context, if it's not inadmissible in all contexts, wealth evidence is certainly inadmissible in this case. And even if it was admissible in this case, the court had to do something to fix the clear misconduct of plaintiff's counsel during closing argument. Something had to be done to ameliorate the risk, the substantial risk, of an unconstitutional verdict. And frankly, it was appropriate to sanction that level of misconduct with an instruction that just took it away from plaintiff altogether. I don't understand why it was misconduct. I think your opponent is right in saying that the check is on the back end with the district court, you know, lowering the award. But why isn't it okay for the plaintiff's lawyer to appeal to the jury as the conscience of the community to send a message to Wells Fargo? Whether that award would ultimately stand or not, part of the purpose of the punitive damages phase of the trial is for the jury to be able to send a message to the defendant that your reprehensible conduct is unacceptable and is not going to be tolerated. So I don't see the harm at all in the plaintiff's lawyer asking for, you know, $2 trillion in punitive damages if that's what he wanted to do so that the jury could express that community outrage. And then, of course, right, there'd be no harm to your client because the district court would have to reduce it. The law is that you can't say anything in closing that misstates the law. And that's a misstatement of the law to say that an award of punitive damages of that magnitude would be appropriate. And the second answer to that question is that due process requires guidance that the jury be guided if there is a significant risk of an unconstitutional award. White talks about that there. If if the jury is not given the kind of instructions that needs to to award an appropriate amount of punitive damages, then that violates due process. Having a review on the back end is not enough. But if counsel, if the amount was incorrect and unconstitutional in the argument, why not just strike that particular argument and let the jury consider net worth, which is is typically done? Why wouldn't that have been the remedy? Well, for one thing, that's not preserved as an alternative remedy because plaintiff didn't didn't ask the court to take that alternative approach. And in fact, conceded that an instruction would be appropriate and didn't object to the instruction that was given. But that's not an appropriate remedy in this context because it was such an egregious violation, egregious misconduct. Unless the court has further questions. Wells Fargo's just asked that the judgment be affirmed. I don't hear any other questions, so we'll hear. I want to address a few points that Wells Fargo's counsel just made on the on the net worth instruction. So first, the argument on prejudice is that because the jury awarded zero dollars, we know that this didn't prejudice the jury punitive damages award. That argument would make sense possibly if this was, say, a nominal damages award. So if the jury had award, say, one dollar as nominal damages, then punitive damages would be needed to punish or deter any defendant, regardless of that defendant's wealth. Here, the jury awarded one hundred thousand dollars in compensatory damages. And so that amount of money is sufficient. No punitive damage is needed. If, say, the defendant was an individual or a small business, a company without much net worth, then perhaps that amount of money would be sufficient deterrence and punishment all on its own. So the net worth was needed for the jury, not just to determine what amount of punitive damages to award, but whether to award punitive damages at all. Whether any punitive damages were necessary in addition to the one hundred one thousand dollars in compensatory damages to punish and deter the defendant. So that's that's one point. And the second point on admissibility. Wells Fargo's argument about whether net worth was admissible in this case is it really hinges on two things. The first is State Farm and White just has squarely rejected that argument. White says very clearly what State Farm says is that wealth is not admissible or rather that wealth does not determine the constitutionality of the punitive damage. And that's because the constitutional ceiling is determined by factors like notice. Did the defendant know that this misconduct would lead to this kind of a penalty? And it's about the ratio of harm to punitive damages. And neither of those factors is affected by wealth. So that's what the court's decision is with State Farm. Rather, what White says very clearly is that the admissibility of net worth for the jury's determination, which is about how much money is necessary to punish and deter this defendant. What White says is that is both lawful and appropriate. And so White just has already squarely rejected Wells Fargo's argument in this case. And then Wells Fargo's other argument as well, this is an FCRA case. It's not a case, you know, say where someone murdered someone. Right. But the problem with that argument is it doesn't matter what kind of case we're talking about. The jury still needs some tool to be able to know what amount of money is going to cause what amount of sting to the defendant. And the district court took away that tool. And that tool is necessary in every case, not just cases of physical harm. Can I just ask you a kind of a procedural question? So as I understand it, the parties had stipulated to what Wells Fargo's net worth was at the time. Is that correct? That's correct. And the judge at some point along the way had settled the jury instruction. Is that correct? That's correct, too. So when you go to the jury instructions that were actually settled and finalized, there's nothing in the jury instructions about telling the jury in these instructions that you can consider net worth. Nor is there anything that suggests they can't. Right? So the way this happened is there was a jury instruction, I believe, about net worth that the judge took out. And then immediately after the plaintiff's closing argument, the judge issued a jury instruction right then that said you cannot consider net worth. So there was a separate jury instruction on net worth? That's correct. That was removed? It was, I believe, yes, there's correct. There was an instruction on net worth that was removed from the end of the punitive damages. Is that in the record, that instruction? I am not sure if it is in the excerpts. It is almost certainly in the district court record, and I'd be happy to find the document with that and submit that to you. So let me ask you this. There was no complaint or there was no objection to the content of the punitive damages instruction. Is that right? Besides the exclusion of net worth, I do not know of one. I'm not sure whether there was wrangling about other aspects of the punitive damages instruction. It looks like it's pretty standard. It looks like it was modeled after the Ninth Circuit punitive damages instruction. Yeah, that's my understanding. Is that right? I'm sorry? Is that right? I believe so, yes. Okay. All right. Thank you. Thank you. I notice I'm out of time, so I just want to note that we've been talking about net worth and we've been talking about these procedures in isolation. But I want to note that what the district court did is made all of these errors in conjunction with each other, which meant that the jury just fundamentally lacked the tools it needed to award punitive damages. And for that reason, a new trial on punitive damages is necessary. Okay. Thank you, counsel. We appreciate your arguments in this case, and the matter is submitted at this time.
judges: Paez, Watford, Tunheim